UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Tori Gilman

      v.                          Civil No. 10-cv-265-JD
                                       Opinion No. 2011 DNH 032

Michael J. Astrue, Commissioner,
Social Security Administration


O R D E R


Tori Gilman seeks judicial review, pursuant to 42 U.S.C. §
405(g), of the decision of the Commissioner of the Social
Security Administration, denying her application for social
security benefits.  Gilman moves to reverse the Commissioner's
decision, contending that the Administrative Law Judge ("ALJ")
erred in failing to give substantial weight to her treating
physician's opinions and in failing to consider the record
evidence pertaining to her likely absences from work.  The
Commissioner moves to affirm the Commissioner's decision.


Background

In her application for Disability Insurance Benefits and
Supplemental Security Income filed in June of 2008, Gilman
alleged that she had been disabled since June 15, 2005, due to
chronic pain, fatigue, and migraine headaches.  Gilman was thirty
years old when she filed her application.  She had completed a

General Equivalency Diploma in June of 1999 and had worked as a cashier at a market, maintenance person in a pizza restaurant, and as a teacher's aide in a school.

Gilman's medical records begin with treatment on November 19, 2006, when she had x-rays for chest pain.  She was treated for bilateral pulmonary embolisms and lung lesions.  After being released from the hospital, Gilman was examined by Dr. Tyler Edwards, a family care physician, on December 6, 2006.  Gilman reported that she had back and chest pain and shortness of breath.  Dr. Edwards found no abnormalities.

On January 30 2007, Gilman saw Dr. James McKenna of Seacoast Pain Institute for neck and back pain.  Gilman previously had been diagnosed with Langerhans cell histiocytosis, an unusual lung disease that could lead to lung lesions.  Gilman also reported back, neck, wrist, and shoulder pain, along with headaches.  A CT-scan of her chest on February 7, 2007, showed a mild depression in the wall of her chest, normal heart size, postoperative changes in the lungs but no evidence of infiltrates or pleural effusion.  When Dr. McKenna saw Gilman on February 16, she complained of spine pain from her neck to her feet.  He noted that she had normal lab results, normal thoracic views, and a small inconsequential lumbar disc herniation.  He also noted a negative rheumatoid arthritis workup.

Gilman reported to Shelley Landry, M-PAC, at Seacoast Pain Institute, on March 5, 2007, that the medications she had used had not helped her diffuse body pain.  Gilman was prescribed Neurontin for pain.  On March 16, 2007, Gilman was seen in the emergency department at Frisbie Memorial Hospital for complaints of pain in the left upper quadrant of her lungs and was discharged with a prescription for Vicodin.

On March 19, 2007, Dr. McKenna saw Gilman for a follow-up appointment and noted that she said Methadone and Neurontin caused intolerable side effects and that she had been prescribed Vicodin at the hospital.  Dr. McKenna wrote:  "I have spoken to her about the appropriateness of this medication[] and it was explained that this is not a medication that we can give her for long-term pain control and that she is taking a significant risk with her life and long-term outlook if she begins to use short-acting medications on a regular basis for chronic pain."  Adm. Rec. at 455.  Dr. McKenna also noted that blood testing was negative for rheumatoid arthritis.  When Dr. McKenna saw Gilman on April 4, he wrote that the MS Contin prescribed at the last visit was providing significant relief for her pain, and he increased her dose.

Gilman had an appointment with Dr. Edwards on May 23, 2007, due to back pain, and she asked him to complete state disability

3

forms.  Dr. Edwards conducted a physical examination which showed localized pain along the paraspinal muscles, and the remainder of the examination had normal results.  Dr. Edwards agreed to complete the form and prescribed medication to help Gilman stop smoking.

On June 7, 2007, Gilman saw Ms. Landry and reported her husband's death.  Gilman said that she was having trouble sleeping and was forgetting to take her medication.  She went for a follow-up appointment with Ms. Landry a month later and reported more frequent headaches and concern that she was now sleeping too much.  Gilman continued to attend appointments with Dr. Edwards and appointments at Seacoast Pain Institute through 2007 with complaints of pain and then shortness of breath and fatigue.

On November 29, 2007, Dr. Edwards completed a Physical Residual Functional Capacity Questionnaire.  Dr. Edwards explained that his treatment history with Gilman included four or five annual visits over the past two and a half or more years. He provided Gilman's diagnoses as degenerative disc disease of the cervical, lumbar, and thoracic spine; pulmonary embolism; and Langerhans histiocytosis.  Dr. Edwards wrote that Gilman's pain was severe enough to cause constant interference with her

4

concentration and attention and that she was moderately able to
cope with work stress.

With respect to Gilman's exertional abilities, Dr. Edwards
indicated that she could walk for two blocks, sit for one hour,
stand for twenty minutes, sit and stand in combination for four
hours and stand and walk in combination for about two hours
during an eight-hour work day, and would need fifteen minutes of
walking every ninety minutes.  He wrote that Gilman would need to
be able to shift her position at will and that she might need
three to four unscheduled breaks of fifteen minutes per day.  As
assessed by Dr. Edwards, Gilman could lift up to ten pounds
occasionally and had significant limitations for repetitive
reaching, handling or fingering, and was likely to miss work
about twice a month due to her impairments.  Dr. Edwards also
stated that his opinion about Gilman's functional limitations was
retroactive to May of 2005.

Gilman was seen in the emergency department twice in
December of 2007, once for leg numbness and then for an abscess.
On December 24, 2007, a tomography scan of Gilman's pulmonary
arteries showed no defect that would suggest pulmonary embolism,
and other regions were normal.  At an examination for a
productive cough, Gilman reported that she was walking about a

half a mile almost daily.  The physician noted that her CT scan
showed no evidence of pulmonary embolism.

     In February of 2008, Ms. Landry continued Gilman's
prescription for MS Contin.  Gilman saw Dr. Edwards on March 4,
2008, with headaches, which might have been caused by increased
stress.  Dr. Edwards noted that otherwise Gilman was fairly
stable.  On March 7, 2008, Gilman went to the emergency
department at Frisbie Memorial Hospital complaining of a migraine
headache.  A CT scan showed no evidence of hemorrhage or acute
abnormality.  Testing for hypercoagulability provided normal
results, and an examination for joint pain noted tenderness but
negative test results.  At Gilman's health maintenance check on
May 27, 2008, Dr. Edwards noted that Gilman had smoked for twenty
years and was not interested in stopping.  Gilman denied chest
pain, cough, dyspnea, wheezing, muscle aches, and joint pain and
swelling.

     Dr. Edwards completed a physical capacities form for the New
Hampshire Department of Health and Human Services on May 27,
2008.  Dr. Edwards stated that Gilman could not perform work at
any exertional level and that she could not work because of
chronic pain that required medication which negatively effected
her focus and concentration.  Physically, Gilman could sit for
three hours, stand for two hours, and walk for two hours, with

ten to fifteen minute breaks approximately every hour.  She could lift and carry up to twenty pounds occasionally, and she could occasionally kneel, bend, climb stairs, reach or twist, use either hand for manipulative activities up to ten pounds, and use her feet to lift up to twenty-five pounds.  She could never crouch, climb ladders, or crawl.  She also needed to avoid extreme cold, hazardous areas, noise, and vibrations.

In June of 2008, Gilman completed a function report to support her disability application.  She said that she took care of her children, ages ten and thirteen, cooked, and did the dishes.  She reported that she was not able to walk as much, only a half mile a day, that she could lift up to ten pounds, that she had trouble bending and kneeling, and that she could not sit longer than thirty minutes.  She also reported that she could pay attention as long as she was being talked to and could follow written and spoken directions.

On July 22, 2008, a state disability determination services consultant physician, Dr. Hugh Fairley, reviewed Gilman's records and completed a Physical Residual Functional Capacity Assessment Form based on his review.  On the form, Dr. Fairley indicated that Gilman could frequently lift and carry ten pounds and could occasionally lift and carry twenty pounds.  He wrote that Gilman could stand, walk, or sit for six hours during an eight-hour work

7

day, had unlimited ability to push and pull, was limited to
occasional postural activities such as crouching, had no
manipulative limitations, and needed to avoid exposure to
respiratory irritants.  Dr. Fairley assessment was consistent
with an ability to do light work.

Gilman returned to Seacoast Pain Institute on June 20, 2008,
reporting good results on MS Contin although she was moving
slowly because of pain in her neck, low back, arms, and
shoulders.  She had injection therapy for her upper back and neck
pain on September 4, 2008.  At an appointment with Dr. Edwards on
November 5, 2008, Gilman reported that the injections worsened
her pain.  She said that her pain went through her whole body,
was present all of the time, and was worse with activity.  She
also said she was not taking pain medication.  Dr. Edwards noted
that Gilman had recently stopped smoking.  Based on his
examination, Dr. Edwards wrote that Gilman had normal muscle
sensations and range of motion with mild pain in the neck
paraspinal muscles.  He noted that Gilman's pain was out of
proportion to the findings on examination and the results of her
MRI.  He told Gilman to continue physical therapy and ibuprofen.

Dr. Edwards also completed a statement on Gilman's physical
capacities on November 5, 2008.  Dr. Edwards stated that Gilman
could do sedentary activities but that she would need frequent

8

breaks if she were doing work at the light level that required frequent walking or lifting objects of more than ten pounds.  In his opinion, Gilman could sit for six hours out of an eight hour work day, although she would need a break every hour to change position.  She could occasionally lift or carry up to twenty pounds, and she could occasionally kneel, bend, and climb stairs. She could never lift or carry more than twenty pounds, crouch, or climb ladders.  Dr. Edwards also stated that Gilman could participate in work-related activities for only twenty-six to thirty hours per week.  In response to the question about how long Gilman's restrictions would last, Dr. Edwards wrote "undetermined."

The next day, November 6, 2008, Gilman met with Ms. Landry at Seacoast Pain Institute and reported that her neck pain and headaches were worse since she had injections for pain.  Gilman said that the pain medications prescribed by Dr. Edwards were not helpful and that she had run out of her sleep medication and was not sleeping well.  Ms. Landry renewed Gilman's sleep medication and noted that a cervical spine issue or facet arthropathy could be contributing to Gilman's headaches and pain.

On February 10, 2009, Gilman reported to Ms. Landry that cervical medial branch blocks, which had been administered on February 4, had increased her pain in the rear of her neck and

radiating to her shoulder.  Ms. Landry concluded that the nerve
and branch blocks had not benefitted Gilman's pain issues.  A
cervical spine MRI done on February 25, 2009, showed no
herniation or abnormality.  A thoracic spine MRI done on March
21, 2009, showed a lesion between two vertebrae, which was not
likely to be pathological, and a mild disc protrusion that did
not cause stenosis or narrowing but might indent the ventral
cord.

On April 3, 2009, Gilman saw Dr. Stephen Holman at Seacoast
Pain Institute.  She reported that the block injections made her
pain worse, that she had constant left side migraine headaches,
and that the medication for sleep was not working.  Dr. Holman
noted that Gilman was alert, oriented, and walking normally.  He
told Gilman that he did not have much else to offer her and also
asked her about smoking because she smelled strongly of tobacco
smoke.  Gilman said that she had stopped smoking and that the
smoke smell was from her family and friends.  Dr. Holman thought
that Gilman might be a candidate for a long-term pain medication.

At an appointment on April 23, 2009, Gilman told Dr. Edwards
that the medication, Neurontin, had not helped so she had stopped
taking it.  She also said that she had lost feeling in her left
knee, which had caused her to fall.  Dr. Edwards planned to try

the medication, Lyrica.  A CT scan and X-rays of her chest, done
on May 7, 2009, showed no significant changes.

Dr. Edwards referred Gilman to Dr. Sonita Estrada at
Seacoast Arthritis & Osteoporosis Center for her back and neck
pain, and she was seen on May 20, 2009.  Gilman related her
history to Dr. Estrada, including medical advice that she needed
to stop smoking.  On examination, Dr. Estrada noted very spastic
paraspinal muscles and a limited range of motion with bending at
the hip and with lateral rotation of the neck.  Muscle tone and
bulk were within normal limits.  Dr. Estrada cold not find a
reason for Gilman's complaints of severe back and neck pain.

In July of 2009, Gilman complained of feeling chest
tightness.  Chest x-rays and a CT scan of the chest in July of
2009 showed no evidence of embolism, and the results were
characterized as stable.  Imaging of her right leg done the same
day showed excellent blood flow and no evidence of a clot.

Gilman saw Dr. Edwards again on August 6, 2009, for a new
pain in her lower back and down her right leg.  Dr. Edwards found
that Gilman had normal strength but a positive right side
straight leg raise test.  He assessed deteriorated leg and back
pain and prescribed pain killers.  Dr. Edwards recommended
physical therapy, but Gilman said that physical therapy made the
pain worse.  Gilman attended physical therapy from August 14 to

11

August 27, 2009.  She was discharged for non-compliance because she had not shown up for several appointments and had cancelled others.

Gilman reported that the prescribed medications did not help with her pain and said that she was going to take Ibuprofen and the Vicodin she had left.  Gilman had an MRI done of her lumbar spine on August 29, which Dr. Edwards reviewed on September 1, 2009.  The MRI results showed a generalized disc bulge at the L4-5 level with a superimposed right paracentral disc herniation.

On September 15, 2009, Gilman went to Wentworth-Douglass Hospital because of low back pain radiating to her right leg. She saw a neurologist who noted the mild generalized disc bulge at the L4-5 level and other issues in that area.  Following a physical examination, the neurologist assessed lumbar radiculitis, which is an inflamation of the root of a spinal nerve.  The neurologist recommended epidural steroid injections. Gilman received steroid injections but reported little relief.

Dr. Edwards wrote a letter on Gilman's behalf on October 29, 2009.  He stated that Gilman had had another exacerbation of "nerve impinging low back pain."  He further stated that she was unable to work at that time but that he did not expect her to have a permanent disability.

On January 20, 2010, Dr. Edwards updated the Physical
Residual Functional Capacity Questionnaire he had completed on
November 29, 2007.  He added a diagnosis of low back pain and a
bulged disc at L4-5 with radicular right leg symptoms.  On
January 28, 2010, Dr. Edwards wrote a letter on Gilman's behalf
in which he said that he had found Gilman to be severely limited
in her overall functioning because of her pain which was not
controlled and that he found her residual functional capacity to
be severely limited.

An administrative hearing was held on February 5, 2010,
before an ALJ.  Gilman was represented by counsel and testified
at the hearing.  A vocational expert also testified.

Gilman said that the pain in her neck and back prevented her
from working.  In a typical day, she would get up, take a shower,
do dishes, sit down to reduce pain, go shopping if necessary, lay
down, wait for the children to get home from school, cook supper
on a good day, and help the children with homework.  If she were
having a bad day, one of the children would make supper.  She
said that she did not lift anything heavier than dishes, that she
walked a quarter mile to the post office, and that her children
did most of the work around the house.  Gilman further explained
that on a good day she could do more but that on a bad day she

13

would have to lie down and that she had two or three bad days
each week.

The vocational expert testified that Gilman's past work as a
cashier was light and semi-skilled work, her work as a cleaner
was medium and unskilled, her work as a teacher's aide was light
and semi-Skilled, and her work in a fast food restaurant was
light and unskilled.  In the hypothetical posed by the ALJ, the
claimant was above to lift ten pounds frequently and twenty
pounds occasionally, and she was able to stand, walk, and sit for
six hours during an eight hour work day.  She was able
occasionally to climb, stoop, and kneel, and she needed to avoid
respiratory irritants.  She had no limitations in using her hands
for manipulating objects and reaching.

The vocational expert responded that the hypothetical
claimant could do Gilman's past work as a cashier, teacher's
aide, and fast food worker.  When the ALJ added limitations that
she could never crouch, climb stairs, lift more than ten pounds
with her hands and twenty-five pounds with her feet, and that she
could only sit for four hours and stand and walk for two hours
each during an eight hour workday, the vocational expert
testified that the claimant could still work as a teacher's aide
and named other jobs that she could do.  If a ten minute break
every hour were required, that limitation would eliminate the

14

teacher's aide position along with the other jobs he had listed.
In response to limitations added by Gilman's attorney for
bilateral repetitive reaching, handling, and fingering, the
vocational expert testified that only the job of toll collecting
would be eliminated, leaving the other jobs he had named.  If the
claimant required an option to sit and stand and also had
limitations for concentration of up to two-thirds of the day, all
of the jobs would be eliminated.  Similarly, an absenteeism rate
of twenty-four days each year would eliminate all of the jobs.

The ALJ issued his decision on February 25, 2010, concluding
that Gilman was not disabled.  He found that she had mild
degenerative disc disease at L4-5 and mild focal disc protrusion
at T6-7, which were severe impairments but did not meet or equal
a Listing, 20 C.F.R. Part 404, Subpart P, App. 1.  The ALJ
determined that Gilman retained the residual functional capacity
to do light work, limited by only occasional climbing, balancing,
kneeling, crouching, and crawling, along with the need to avoid
exposure to respiratory irritants.  With that retained ability,
the ALJ found Gilman was able to return to her work as a cashier,
a teacher's aide, and a fast food worker.  The ALJ also noted the
vocational expert's opinion about other work that Gilman would be
able to do.  Therefore, the ALJ found that Gilman was not
disabled for purposes of social security benefits.

The Decision Review Board did not complete its review within the time allowed, making the ALJ's decision the final decision of the Commissioner, which is subject to judicial review.  20 C.F.R. § 405.420(a)(2).  Gilman filed a complaint in this court seeking judicial review.

## Standard of Review

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  § 405(g).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is "the inability to do any substantial gainful activity by reason of any medially determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

16

months."  20 C.F.R. § 404.1505(a).  The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520.  The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the burden shifts to the Commissioner to show that work, which the claimant can do despite her disabilities, exists in significant numbers in the national economy.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

Discussion

Gilman contends that the ALJ should have given Dr. Edwards's opinions about her residual functional capacity significant weight and failed to adequately explain his decision not to do so.  She also argues that the ALJ failed to consider Dr. Edwards's opinion that she would have frequent absences from work.  The Commissioner moves to affirm the decision, asserting that substantial evidence supports the ALJ's determination.

A.  Dr. Edwards's Opinions

In making a disability determination, the ALJ is required to consider "the medical opinions in [the claimant's] case record together with the rest of the relevant evidence [in the record]."

20 C.F.R. § 1527(b).  "If any of the evidence in [the claimant's] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the ALJ] will will weigh all of the evidence and see whether [he] can decide whether you are disabled based on the evidence we have."  § 404.1527(c)(2).

In evaluating medical opinions, the ALJ considers the provider's relationship with the claimant and generally gives more weight based on the nature of the relationship.  § 404.1527(d).  An opinion based on one or more examinations is entitled to more weight than a nonexamining source's opinion, and a treating source's opinion, which is properly supported, is entitled to more weight than other opinions.  Id.  A treating source's opinion on the nature and severity of the claimant's impairments will be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  § 404.1527(d)(2).

If a treating source's opinion is not entitled to controlling weight, the ALJ considers the length of the treatment relationship, the frequency of examination, and the extent of the treating source's knowledge about the claimant's impairment to determine what weight, if any, to give the opinion.  Id.  A

18

treating source's opinion will be given more or less weight
depending on the evidence provided to support the opinion, the
degree to which it is consistent with the record, whether the
source is a specialist in the field, and other factors that are
raised by the claimant.  § 404.1527(d).  In all cases, the ALJ
will explain the reasons for giving a treating source's opinion
more or less weight.  Id., see also LaBreque v. Astrue, 2011 WL
285678, at *4-*5 (D.N.H. Jan. 28, 2011).

In evaluating opinions provided by nonexamining consulting
medical sources, the ALJ considers the same factors that apply to
other medical sources.  § 404.1527(f).  An opinion by a medical
source on issues reserved for the Commissioner, such as whether
the claimant is disabled or unable to work, are not medical
opinions.  § 404.1527(e).

In this case, Gilman challenges the ALJ's decision not to
give significant weight to Dr. Edwards's residual functional
capacity evaluation done on November 29, 2007, and updated on
January 20, 2010, which limited Gilman to less than sedentary
work.  Instead, the ALJ gave the opinion of the medical
consultant, Dr. Fairley, significant weight.  The ALJ did not
give Dr. Edwards's January 20, 2010, opinion significant weight
because that opinion, that Gilman was disabled, was inconsistent
with his opinion in October of 2009 that Gilman would likely be

19

able to return to work.  The ALJ also stated that Dr. Edwards's
November 29, 2007, opinion could not be given significant weight
because the assessed limitations were not supported by or
consistent with objective medical findings.

Gilman contends that the ALJ's analysis of the medical
opinions is wrong because there is no conflict between Dr.
Edwards's opinion in October of 2009 and his opinion in January
of 2010.  In the October, 2009, opinion, Dr. Edwards wrote that
Gilman had had an exacerbation of low back pain and could not
work.  He said that he did not expect the disability to be
permanent.  In January of 2010, Dr. Edwards updated his November,
2007, physical capacity assessment by adding information about a
bulging disc at L4-5 with radicular right leg symptoms based on
an MRI done in August of 2009.[1]  The assessment, originally done
in November of 2007, concluded that Gilman was capable of doing
less than sedentary work.

Dr. Edwards's opinions in October of 2009 and January of
2010 are not inconsistent.  Both are based on new pain caused by
the bulging disc at L4-5, which was shown in the August, 2009,
MRI.  Dr. Edwards's statement that he did not expect the symptoms

---

[1]Although the visit was not included in the parties' factual
statement, it appears that Dr. Edwards saw Gilman on January 6,
2010, for back pain.

to cause a permanent disability, in October of 2009, does not necessarily contradict his later opinion that the symptoms had the disabling effects he found in January of 2010.[2]  Further, Dr. Fairley's assessment was based on the record as it existed in July of 2008, before the August 2009 MRI results.  Therefore, the ALJ's reasons for rejecting Dr. Edwards's opinions and crediting Dr. Fairley's opinion are not supported by substantial evidence in the record.

The ALJ rejected Dr. Edwards's November 29, 2007, capacity assessment because it was not supported by the medical record. The record evidence supports the ALJ's decision not to give weight to Dr. Edwards's November 29, 2007, opinion.  Because Dr. Edwards updated that opinion on January 20, 2010, however, the later opinion must be evaluated separately.

Although the Commissioner's review of the record in his motion to affirm provides additional explanation and evidence to support the ALJ's decision not to credit Dr. Edwards' January 20, 2010, opinion, the ALJ did not provide those grounds in his decision.  An agency's action can only be affirmed on the basis provided in the decision.  See Bard v. Boston Shipping Ass'n, 471

---

[2]Contrary to the Commissioner's argument for purposes of judicial review, as noted above, it appears that Dr. Edwards examined Gilman on January 6, 2010, which may have further informed his assessment.

F.3d 229, 244 (1st Cir. 2006); Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005).  Therefore, in the context of reviewing a social security decision, the court cannot consider or provide post hoc rationalizations for the ALJ's decision and instead is limited evaluating the decision "based solely on the reasons stated in the decision," which precludes consideration of other grounds as a means to salvage an otherwise deficient decision. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).

The ALJ's hypothetical questions to the vocational expert incorporated a residual functional capacity assessment based on Dr. Fairley's opinion rather than Dr. Edwards's opinion. Therefore, the record lacks substantial evidence to support the ALJ's findings that Gilman can return to her previous work or do other jobs.

B.  Absences from Work

Gilman also contends that the ALJ erred in failing to discuss Dr. Edwards's opinion that she had good and bad days and would be expected to be absent from work frequently.  Gilman argues that the ALJ was required to consider, separately, Dr. Edwards's opinion about her absenteeism.  In support, Gilman

22

relies on <u>Walker v. Barnhart</u>, 2005 WL 2323169 (D. Mass. Aug. 23, 2005).

In <u>Walker</u>, the claimant applied for social security benefits based on both mental and physical disabilities due to fibromyalgia, chronic fatigue syndrome, post traumatic stress disorder, manic depression, panic attacks, and anxiety disorder. <u>Id.</u> at *11.  The ALJ determined that the claimant suffered from both fibromyalgia and anxiety.  <u>Id.</u> at *15.  The ALJ's decision not to give controlling weight to the medical providers' opinions about the effects of her anxiety, based in part on the claimant's daily activities and the consulting experts' opinions, was accepted.  <u>Id.</u> at *16.  The decision was reversed, however, because the ALJ's finding that the claimant was able to attend work regularly was contrary to the treating physician's physical functional capacity questionnaire responses and the claimant's testimony, and the decision lacked any explanation for discrediting that evidence.  <u>Id.</u> at *18.  The case was remanded "for the ALJ to make explicit findings regarding the extent of Walker's [physical]-related impairment and to factor those findings into his assessment of her [residual functional capacity]."  <u>Id.</u>

Contrary to Gilman's argument, an ALJ is not required to consider and explain every piece of evidence in the record.  <u>See</u>

23

<u>Phillips v. Astrue</u>, 2010 WL 5421351, at *6 (7th Cir., Dec. 23, 2010) ("An ALJ need not address every piece of evidence but must build a 'logical bridge' between the evidence and his findings and adequately discuss the issues so that [the court] can evaluate the validity of the agency's findings." (quoting <u>Jones v. Astrue</u>, 623 F.3d 1155, 1160 (7th Cir. 2010))).  On remand, the ALJ will have the opportunity to consider what weight to give Dr. Edwards's opinions, along with any other evidence provided, in assessing Gilman's residual functional capacity and whether she is disabled.

<u>Conclusion</u>

For the foregoing reasons, the claimant's motion to reverse and remand the Commissioner's decision (document no. 9) is granted.  The Commissioner's motion to affirm (document no. 11) is denied.  The case is remanded pursuant to Sentence Four for further proceedings.

24

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

February 24, 2011

cc:  David F. Bander, Esquire
     Robert J. Rabuck, Esquire
     Roger D. Turgeon, Esquire